UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DYNAMIC ENERGY SOLUTIONS, LLC,

Plaintiff,

v.

SCOTT PINNEY, DISTRIBUTED SUN, LLC,
and SUN8 PDC LLC,

Defendants.

_____

No. 3:18-cv-884 (TJM/DEP)

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff DYNAMIC ENERGY SOLUTIONS, LLC ("Dynamic"), by its undersigned attorneys, Bond, Schoeneck & King, PLLC and Walden Macht & Haran LLP, for its Complaint, alleges as follows:

## INTRODUCTION

1. This case arises from (a) a breach by Defendant SCOTT PINNEY ("Pinney") of a contract to lease to Dynamic real property located in Tompkins County, NY, and (b) a subsequent strategic lawsuit against public participation ("SLAPP") against Dynamic by Defendants DISTRIBUTED SUN, LLC ("Distributed Sun") and SUN8 PDC LLC ("Sun8" and, together with Distributed Sun, "Sun Defendants").

2. Dynamic is a full service solar energy solutions provider that brings together the diverse expertise needed to design, finance, build, and maintain solar energy projects for commercial, institutional, and utility clients. As relevant here, Dynamic is in the business of building photovoltaic power stations (commonly called "solar projects" or "solar farms") that harvest sunlight and convert it to electricity on a large scale. Companies such as Dynamic make

1

a profit in several ways, including by selling the harvested electricity back into the energy grid or by selling or leasing the solar farm to another party.  Dynamic also earns profit as the engineering, procurement, and construction contractor on its solar developments.

3.      Dynamic has developed over 100 commercial and institutional solar energy systems in several states.  Its customers include private institutions such as the YMCA, hospitals such as St. Peter's Hospital in Albany, and government agencies such as the Town of Fairhaven, MA, and the Philadelphia Water Department.

4.      Consistent with this business function, in approximately June 2016, Dynamic executed a Site Lease Option Agreement (the "Dynamic Lease Option") with Pinney.  The Dynamic Lease Option gave Dynamic an exclusive 18-month option to lease a 15-acre parcel of land (the "Dynamic Parcel") that was situated on a larger, 157-acre property owned by Pinney at 2150 Dryden Road in the Town of Dryden, New York (the "Subject Property").  Securing the rights to development property was a necessary precondition for Dynamic prior to obtaining the licenses, permits, and funding, including a lucrative state grant, it needed to develop a solar farm. It also afforded Dynamic the opportunity to conduct due diligence on the feasibility of the solar project, knowing that it had secured reliable development property.

5.      A few months after Pinney entered into the Dynamic Lease Option with Dynamic (*i.e.*, during Dynamic's exclusive window), Pinney leased the exact same property to Dynamic's competitor, Sun8, a wholly-owned subsidiary of Distributed Sun.  Pinney's lease with Sun8 (the "Sun8 Lease") covered the entire Subject Property, necessarily subsuming the Dynamic Parcel. Pinney informed Dynamic of the Sun8 Lease only after Dynamic attempted to exercise its option to lease the Dynamic Parcel under the Dynamic Lease Option.

6.      By that time, Dynamic had already expended substantial cost and effort to apply for and obtain necessary approvals to make its proposed project feasible.  Dynamic had also applied for, and was awarded, a grant from New York State's renewable energy agency, NYSERDA, of approximately $1.05 million, which was restricted to use *only* on the Subject Property—which had now been leased to Sun8, meaning that the grant would have to be forfeited.

7.      Facing a major economic loss, Dynamic contacted Pinney and the Sun Defendants seeking to propose a mutually acceptable solution.  The Sun Defendants refused Dynamic's proposal, and Pinney, for his part, doubled down on his breach of the Dynamic Lease Option by recording the Sun8 Lease for Sun8's benefit, and issuing an "estoppel certificate" to Sun8 stating that the Sun8 Lease had priority to the land.

8.      As a result of Pinney's breach, Dynamic lost the unique opportunity to build a solar farm on the Dynamic Parcel, resulting in millions of dollars of damages—including wasted cost outlays, loss of the state grant, loss of expected profit, loss of the value of its development, and wasted time.

9.      Meanwhile, the Sun Defendants applied for permits, zoning changes, licenses, and/or other permission from the Town of Dryden (the "Town") to build their proposed solar farm on the Subject Property.

10.     Shortly after these initial applications—which occurred in the immediate aftermath of Dynamic's discovery of the Sun8 Lease, and before Sun8 and Pinney had rejected Dynamic's overtures to find a solution to the competing property claims—Dynamic's General Counsel sent a letter to the Town's supervisor, requesting that the Town take no action on the Sun Defendants' pending applications until the parties could discuss and resolve their dispute.

11.     On the basis of this communication, along with other unspecified "contact[] with [T]own officials, members of the Dryden Planning Board and/or Town Board, and [T]own residents," the Sun Defendants sued Dynamic in New York State Supreme Court, Tompkins County, in an action titled *Sun8 PDC LLC v. Scott Pinney and Dynamic Energy Solutions, LLC*, Index No. 2017-0241 (the "Sun8 Lawsuit," attached hereto as Exhibit 1), for, among other things, tortious interference with contract (the "TIWC Claim").

12.     Accordingly, and for the reasons described below, the Sun Defendants thereby violated New York's anti-SLAPP statutes.

13.     The Sun8 Lawsuit qualifies as a SLAPP suit under New York Civil Rights Law § 70-a because (a) it was commenced by public applicants (Distributed Sun and Sun8) and, (b) by its own terms, it was materially related to Dynamic's alleged efforts to challenge or oppose these Defendants' public application.

14.     As described in detail below, the TIWC Claim could not possibly have had a substantial basis in fact and law, nor could it possibly have been supported by a substantial argument for the extension, modification or reversal of existing law.  The claim was so frivolous that Sun8 eventually voluntarily discontinued it following a fully-briefed motion to dismiss and other unnecessary motion practice.  Accordingly, Dynamic is entitled to costs and attorney's fees under New York Civil Rights Law §§ 70-a(a).[1]

15.     As further demonstrated below, moreover, the Sun Defendants filed the SLAPP suit to harass, intimidate, punish, or otherwise inhibit Dynamic's free exercise of its speech, petition, or association rights.  This intent is manifestly clear from the Sun Defendants' own

---

[1]     Section 70-a(a) provides that "costs and attorney's fees may be recovered upon a demonstration that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law."

statements.   Distributed Sun's Chief Executive Officer ("CEO") called Dynamic's CEO and threatened to "f@$% [Dynamic] up."  Distributed Sun directed the filing of the Sun8 Lawsuit the next day.  Accordingly, Dynamic is entitled to compensatory damages under New York Civil Rights Law §§ 70-a(b),[2] and punitive damages under New York Civil Rights Law §§ 70-a(c).[3]

## THE PARTIES

16.     Plaintiff Dynamic Energy Solutions, LLC, is a full-service solar energy provider located at 1550 Liberty Ridge Drive, Suite 310, Wayne, Pennsylvania 19087.  Every member of Dynamic Energy Solutions, LLC is a resident of Pennsylvania.

17.     Defendant Scott Pinney is the owner of the Subject Property.  He resides in Ithaca, New York.

18.     Upon information and belief, Defendant Distributed Sun is a solar energy developer, organized under the laws of the State Delaware and with a principal place of business in Washington, D.C.   Upon information and belief, none of its direct or indirect members is a citizen of the State of Pennsylvania.

19.     Upon information and belief, Defendant Sun8 is a wholly owned subsidiary of Distributed Sun.

---

[2] Section 70-a(b) provides that compensation damages are available "upon an additional demonstration that the action involving public petition and participation was commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights."

[3]     Section 70-a(c) provides that punitive damages are available "upon an additional demonstration that the action involving public petition and participation was commenced or continued for the *sole* purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights."

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this case, under 28 U.S.C. §

1332, because the Parties are citizens of different States and the amount in controversy exceeds

$75,000.

21.     Venue is properly in the district pursuant to 28 U.S.C. § 1391 because Defendant

Pinney resides in this District and because a substantial part of the events and omissions giving

rise to the claims set forth herein occurred in this District.

## FACTS

### Pinney's Breach of Contract

*Dynamic and Pinney Agree to the Dynamic Lease Option*

22.     On November 12, 2014, Dynamic entered an agreement with Ron Szymanski, a

land broker in Tompkins County, New York, for Szymanski to identify property in New York

appropriate for developing a solar farm.  Upon information and belief, Pinney and Szymanski

also had an agency relationship with each other, whereby Szymanski would seek a suitor to lease

Pinney's property.

23.     Szymanski contacted Dynamic on or about September 24, 2015, with a

recommendation to seek to lease a parcel on the Subject Property.  A representative of Dynamic

conducted a site visit to the Subject Property on or about October 21, 2015, and determined that

the land was suitable for development of a solar farm.

24.     Accordingly, with Szymanski acting as an intermediary, Dynamic and Pinney

negotiated an option to lease land on the Subject Property.  Under the proposed option, Dynamic

would pay Pinney a fee and in exchange would receive, for an agreed-upon duration, the

exclusive right to lease land. This exclusive window would give Dynamic the opportunity to

conduct due diligence, apply for permits and grants, and to otherwise examine the economic

6

feasibility of its prospective solar project.  The negotiations with Pinney began in approximately winter or spring 2016 and culminated in approximately June 2016.  During this time, upon information and belief, Pinney authorized Szymanski to negotiate on Pinney's behalf.

25.     Finally, in May and June 2016, Dynamic and Pinney, with Szymanski as intermediary, agreed to proceed with a lease option for a parcel of approximately 15 acres (the "Dynamic Parcel") within the Subject Property.  They drafted a Site Lease Option Agreement (the "Dynamic Lease Option") and delineated the boundaries of the Dynamic Parcel by exchanging written descriptions of the property as well as exchanging an annotated map.  On or about June 10, 2016, the parties finalized the description of the Dynamic Parcel, which they circulated as Attachment 1 to the Dynamic Lease Option.  The language was as follows: "A portion of real property of about 15 acres contained within Tax Map# 38.-1-3.1, Town of Dryden, Tompkins County, New York, located at 2150 Dryden Road, Dryden, NY 13053. The western boundary described at property line found in Deed 59828/8001. The southern boundary along property line shared with cemetery to a point near main entrance. The eastern boundary will run North from main entrance no more than 500 ft to a point. From that point, the northern boundary completing the solar facility parcel will run approximately parallel to the southern boundary to the western boundary line."

26.     By the terms of the Dynamic Lease Option, for which Dynamic paid Pinney $1,000, Dynamic acquired the "exclusive right and option to acquire the [s]olar [r]ights for a period of eighteen (18) months" which "may be extended for an additional six months."   Upon exercising its option, Dynamic would have the right to lease the Dynamic Parcel for an initial 25-year term plus two additional five-year terms at Dynamic's election.  In exchange, Dynamic would pay "an annual rent that is equivalent to $5,360 per MW DC capacity (approximately

$1000 per acre),” with “an annual increase of one percent (1.0%) on each anniversary of the Site Lease's effective date.”

27.     The parties agreed that Dynamic would exercise its option by notifying Szymanski.

28.     Pinney executed the Dynamic Lease Option on June 23, 2016, and Dynamic countersigned on July 7, 2016.  Dynamic sent Pinney a check for $1,000, which he cashed or deposited on or about September 20, 2016.

***Dynamic Expends Resources and Obtains Grants in Reliance on the Dynamic Lease Option***

29.     Upon securing the exclusive right to the Dynamic Parcel, Dynamic began the costly and time-consuming process of applying for the necessary infrastructure upgrades and New York State grants.

30.     For example, Dynamic invested substantial time and money to complete and submit a detailed application to the New York State Energy Research & Development Authority (“NYSERDA”) to obtain an incentive award to construct a solar project on the Property.

31.     NYSERDA granted Dynamic the incentive award “in the amount of $1,051,655.44” to develop a solar project on the Subject Property.  These funds, which were awarded on or about September 22, 2016, were essential for Dynamic to profitably develop its solar project on the Subject Property.  The grant, however, was restricted:  it could be used only on the Subject Property.

32.     Dynamic also invested substantial time and money to secure utility studies and to apply to the New York State Electric and Gas Corp. (“NYSEG”) for an “interconnection” on the Subject Property.  An “interconnection” is a physical connection between a photovoltaic power

station and the utility company's wires that allows companies like Dynamic to send electricity from its solar arrays back into the electricity grid.

***Pinney Leases the Dynamic Parcel to Sun8***

33.     Even as Dynamic was investing time and money and pursuing state grants that could only be used at the Subject Property, Pinney pursued other suitors to lease the same land he had already promised to Dynamic.

34.     On or about June 23, 2016—the very day he executed the Dynamic Lease Option—Pinney signed a non-binding Letter of Intent setting the terms of a potential agreement with Sun8 to lease an 11-acre parcel on the approximately 157-acre Subject Property.  This would have left enough room on the Subject Property for both companies, but over the next few months, Pinney and Sun8 expanded their plans.

35.     On or about October 11, 2016, Pinney and Sun8 signed the Sun8 Lease for a parcel on the Subject Property of approximately 49.1 acres.

36.     Upon information and belief, after signing its initial lease, Sun8 applied to install an interconnection point to the electrical grid on the Subject Property.  When it did so, Sun8 was told that there was another applicant ahead in line on the same property.  Thus, Sun8 was on notice that Pinney had leased a portion of the Subject Property to another solar developer.

37.     Nevertheless, in approximately January 2017, Sun8 and Pinney explored a further expansion of their lease agreement.  On or about January 29, 2017, Pinney and Sun8 executed an Amendment to the October 2016 lease agreement.  The amended Sun8 Lease was for the entire Subject Property, which necessarily subsumed the Dynamic Parcel.

*Dynamic Exercises Its Lease Option and Pinney Refuses to Honor It*

38.     Pinney, however, did not inform Dynamic that he had leased the Dynamic Parcel to Sun8.  On January 31, 2017, Dynamic exercised its option to lease the Dynamic Parcel in accordance with the notice provision contained in the Dynamic Lease Option.  In addition to informing Pinney and Szymanski in writing that it was exercising its option, Dynamic also provided them with a draft proposed lease agreement.  Upon information and belief, Szymanski delivered both of these documents to Pinney.

39.     On or about February 14, 2017, Szymanski admitted to Dynamic that Pinney had leased the Dynamic Parcel to Sun8.

40.     Dynamic contacted Sun8 the same day, informing Sun8 that Pinney had leased the same land to two different companies, and seeking a good-faith discussion about how to proceed.

41.     Over the next several weeks, Dynamic, Pinney, and Sun8 engaged in communications regarding the conflicting Dynamic Lease Option and the Sun8 Lease.  After Dynamic had an opportunity to review a map of the land leased to Sun8, it notified Pinney of the direct conflict between the Dynamic Lease Option and the Sun8 Lease.  Dynamic pressed forward with exercising its option, and on March 6, 2017, Szymanski hand-delivered to Pinney the notice from Dynamic that it was exercising its option, as well as a draft lease agreement.

42.     On that very same day, March 6, 2017, notwithstanding the fact that Pinney and his counsel, Charles Guttman, knew that the Dynamic Parcel was subsumed by the land being leased to Sun8 in the Sun8 Lease, Guttman filed an instrument to record the Sun8 Lease for Sun8's benefit.

10

43.     On March 24, 2017, Pinney convened a conference call with representatives from both Dynamic and Sun8.  Although Pinney admitted on this call that he had entered into, and was obligated by, the Dynamic Lease Option, he refused to fulfil his obligations by leasing the Dynamic Parcel to Dynamic.

44.     On April 28, 2017, Guttman issued Sun8 an estoppel certificate stating that "to the best of [his] knowledge ... the [Sun8 Lease] has priority over any other lease[.]"

45.     In short, Pinney, acknowledging that he entered into dueling contracts, cleared the way for Sun8 and refused to adhere to his obligations in the Dynamic Lease Option.  Each of these actions were taken in breach of the Dynamic Lease Option.

**_Pinney's Breach of Contract Caused Substantial Losses to Dynamic_**

46.     By virtue of Pinney's breach of contract, Dynamic lost all of the investment of time, money, and resources expended for the project.  It also lost the NYSERDA grant.

47.     Dynamic also lost an estimated $1,575,664 that it would have earned as an engineering, procurement, and construction contractor on the solar development.

48.     Dynamic also lost future profits that it was reasonably certain to obtain, or, in the alternative, the loss of value of the completed solar development.

49.     Dynamic is an experienced solar developer.  It has developed more than 100 solar projects such as the one planned on the Subject Property.  Dynamic can profit in several ways, including (a) by selling the electricity back into the energy grid or (b) by selling or leasing the solar farm to another party.

50.     In the first approach, selling the electricity back into the energy grid, Dynamic's lost profits include the net value of the solar power that Dynamic would have sold over the life of

11

the lease.  Dynamic's lost profits exceeded $5,000,000 for the first 25 years of the proposed lease.

51.     A viable secondary market also exists for Dynamic to have chosen the second approach, selling or leasing the solar farm to another party.   Over the life of the lease these operating rights would have been worth at least $4,000,000.

### The Sun Defendants' SLAPP Lawsuit

***Sun8 Becomes a "Public Applicant" by Applying for Town Permits and Zoning Approvals***

52.     Upon information and belief, the Sun8 Lease allowed it to develop up to and including the entire Subject Property.  This is approximately ten times larger than the Dynamic Parcel, which was approximately 15 acres.

53.     Under the relevant laws and regulations in existence at the time of the execution of the Sun8 Lease, Sun8 was required to seek zoning, Town Board, and Planning Board approval before developing its planned solar project on the Subject Property.   To that end, upon information and belief, Sun8 and Distributed Sun submitted to governmental bodies at least five separate applications for site plan approval and subdivision approval, and for at least one special use permit, which was submitted in the name of "Sun8 PDC LLC (C/O Distributed Sun, LLC)". Distributed Sun also appeared and participated in public meetings and hearings in connection with these applications.

54.     On March 16, 2017, the day the Town Board was scheduled to consider an application by the Sun Defendants at a public meeting, Dynamic emailed the Dryden Town Supervisor Jason Leifer in his capacity as an elected official.  The communication informed the Town Supervisor about the existence of the Dynamic Lease Option.  It stated that Dynamic had only recently learned about the Sun8 Lease, and that Dynamic was trying to reach a resolution

with Sun8.  The communication requested that the Town not take action on Sun8's application until Dynamic and Sun8 had an opportunity to resolve their dispute.

55.     Upon information and belief, Sun8's applications were approved in August 2017. After a subsequent legal challenge by a third party unrelated to the instant action, the New York Supreme Court, Tompkins County, found that between February 2017 and August 2017, "the Town Board, Planning Board and other municipal organizations held meetings in connection with the proposed solar project. Those meetings culminated in the Town Board granting a Special Use Permit and Site Plan approval on August 17, 2017, and the Planning Board approving the Subdivision Preliminary Plat on August 24, 2017." *Willow Glen Cemetery Ass'n v. Dryden Town Board*, Index No. EF2017-0208 (Sup. Ct. Tompkins Cty. Dec. 22, 2017) (Faughnan, J.)

56.     By virtue of the forgoing, Distributed Sun and Sun8 were "public applicants or permittees" within the meaning of the New York Civil Rights Law §§ 70-a and 76-a.

***Sun8 Threatens to Punish Dynamic by Filing a Harassing SLAPP Lawsuit***

57.     On or about October 25, 2017, Dynamic's counsel issued document preservation notices by e-mail and overnight mail to Pinney and Sun8.

58.     Dyanmic sent the document preservation notices in anticipation of litigation against Pinney for breach of contract and other related claims.

59.     The following day, on or about October 26, 2017, the CEO of Distributed Sun, Chase Weir ("CEO Weir"), placed two calls to Dynamic.

60.     The first call was to Cheryl Cramer, the Senior Business Development Manager at Dynamic, and the second call was to Michael Perillo, Dynamic's CEO.

61.     Cramer was not at her desk and missed the initial call, but saw the missed call on her phone and dialed the number back when she returned from lunch.

62.     CEO Weir spoke to Cramer in an angry manner.  Among other hostilities, he told Cramer that Dynamic "has done a bad action."  He then slammed the phone down and hung up.

63.     On the call with Perillo, CEO Weir was threatening and hostile.

64.     CEO Weir asked Perillo, in substance, whether Perillo had authorized the document preservation letter.  Perillo responded, in substance, that he did not want to discuss the letter or the matter.

65.     CEO Weir then told Perillo, in substance, that Distributed Sun had already spent $70,000 in June and/or July 2017 (while Sun8's applications for permits and zoning approvals were still pending) drafting a lawsuit against Dynamic for "tortious interference."

66.     CEO Weir further told Perillo that he now planned to file the lawsuit the next day, which was Friday, October 27, 2017.

67.     CEO Weir claimed he was prepared to spend $500,000 to litigate his lawsuit.

68.     CEO Weir concluded by telling Perillo, "I'm going to f@$% you up.  I'm going to f@$% you."

### Distributed Sun and Sun8 Files a SLAPP Suit Against Dynamic

69.     CEO Weir made good on his threat to punish Dynamic.  Just as CEO Weir stated to Perillo, the Sun Defendants filed the Sun8 Lawsuit against Dynamic on October 27, 2017.

70.     And just as CEO Weir stated to Perillo, one of the causes of action was the TIWC Claim that Distributed Sun and Sun8 had drafted during the period of its public applications. The core of Sun8's TIWC claim, in fact, focused on Dynamic's alleged engagement with elected officials and others during the Sun Defendants' application process.

14

71.     For example, that cause of action alleged, plainly and clearly, that "Dynamic's wrongful behavior included contacting town officials, members of the Dryden Planning Board and/or Town Board, and town residents for the purpose of obstructing, opposing, and interfering with the permitting process for Plaintiff's solar project."

72.     The lawsuit also alleged that Dynamic "actively provoked opposition from town residents against Plaintiff's solar project and worked to disrupt the town permitting process."

73.     Accordingly, the Sun8 Lawsuit, and the TIWC Claim in particular, was "materially related to any efforts by the defendant [Dynamic] to report on, comment on, rule on, challenge, or oppose" the Sun Defendants' public applications, within the meaning of New York Civil Rights Law §§ 70-a and 76-a.

74.     Moreover, because the Sun Defendants were public applicants, Sun8's Lawsuit against Dynamic constituted an "action involving public petition and participation" within the meaning of New York Civil Rights Law §§ 70-a and 76-a.

75.     Sun8 further admitted in its opposition to Dynamic's motion to dismiss that it had filed a SLAPP lawsuit, stating that "Sun8 has alleged that Dynamic spoke actionably and tortiously to the Town of Dryden and others"; that Dynamic's "misuse of … government processes has caused various governmental and private actors to take or not take actions, to the detriment Sun8's [sic] ability to pursue its project"; and that "the protracted duration of the Town Board and Planning Board proceedings have affected Sun8's ability to raise capital from investors for the venture."  Opp. Mem. At 2, 20, 24-25.

***The Sun8 Lawsuit Had No Basis in Fact or Law, and Caused Dynamic Substantial Damage***

76.     As described below, Sun8's TIWC Claim was logically and factually incoherent. It could not possibly have had a substantial basis in fact and/or law, nor could it possibly be supported by a substantial argument for the extension, modification, or reversal of existing law.

77.    In fact, the claim was so nonsensical that Sun8 eventually withdrew it, but only after Dynamic was forced to incur substantial costs filing, fully briefing, and preparing for oral argument on a motion to dismiss.  Additionally, Sun8 violated New York's automatic stay of discovery during a pending motion to dismiss by subpoenaing two non-party witnesses for deposition testimony concerning its TIWC Claim.  When Sun8 refused to withdraw those subpoenas, Dynamic had to apply for relief from the Court, which also resulted in substantial costs.  The Court agreed with Dynamic and signed an order confirming the stay of discovery.

78.    The core elements of a tortious interference with contract claim are (1) a valid, existing contract between the plaintiff and a third-party; (2) the defendant's knowledge of the contract; (3) intentional and improper conduct by the defendant; (4) through which the defendant procures; (5) the third-party to breach his contract; (6) resulting in damages.

79.    Sun8 alleged only one of these elements:  that the valid, existing contract at issue was the Sun8 Lease between Sun8 and Pinney, which was initially executed in October 2017. Sun8 did not satisfy a single additional element necessary to make a *prima facie* case.  For example:

      a.    Sun8 *admitted* that Pinney had <u>fully performed</u> on the contract by delivering the property to Sun8, even favoring the Sun8 Lease at Dynamic's expense.  Thus, there was no actual breach by Pinney (fifth element).  Sun8 alleged only that Pinney made misrepresentations when executing the Sun8 Lease—namely, he neglected to tell the Sun Defendants about the Dynamic Lease Option—which Sun8 styled as a "breach of contract."

b.   Of course, Dynamic could not have procured such a breach (fourth element), because Dynamic signed the Dynamic Lease Option months earlier.

c.   Dynamic also therefore could not have known about the Sun8 Lease (second element) when it signed the Dynamic Lease Option, because the Sun8 Lease did not yet exist.

80.   Sun8 not only failed to allege that Dynamic knowingly induced a breach of contract, it also failed to allege that Dynamic used *wrongful means* to do so (fourth element). That failure is hardly accidental. The fundamental constitutional rights to freedom of speech, petitioning the government, and of assembly that underlie Civil Rights Law §§ 70-a and 76-a, also foreclose, under settled and longstanding law, Sun8's claim that Dynamic "tortiously interfered" with Sun8's permit and zoning applications by engaging in public participation, such as contacting government officials and organizing popular opposition to Sun8's application.[4]

---

[4] Such acts are constitutionally protected and immunized from tort liability by the *Noerr-Pennington* doctrine. *See E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 657 (1965); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Numerous New York state and federal decisions have held that *Noerr-Pennington* forecloses Dyanmic's TIWC Claim as a matter of law. *See, e.g., Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135, 1135 (2d Cir. 2000) ("*Noerr Pennington* immunity is applicable to . . . state-law claims such as fraud and tortious interference"); *Alfred Weissman Real Est., Inc. v. Big V Supermarkets, Inc.*, 268 A.D.2d 101, 107 (2d Dep't 2000) (noting the Doctrine's expansion to protect the "petitioning of the government from claims brought under Federal and State law, including . . . tortious interference with contractual relations"); *Concourse Nursing Home v. Engelstein*, 278 A.D.2d 35, 35 (1st Dep't 2000) (same); *EDF Renewable Dev., Inc. v. Tritec Real Est. Co., Inc.*, 147 F. Supp. 3d 63, 63 (E.D.N.Y. 2015), *lv dismissed,* (2d Cir. 2016) (dismissing complaint because the *Noerr Pennington* doctrine barred solar developer's tortious interference with contract claim); *Icahn v. Raynor*, 32 Misc. 3d 1224(A), 2011 WL 325041 at *5, N.Y. Slip Op. 51416(U) (Sup. Ct. N.Y. Cty. June 16, 2011) ("The *Noerr-Pennington* doctrine also bars Plaintiffs' claim for tortious interference with contract based upon . . . a petition of a government agency"), *aff'd*, 99 A.D.3d 546, 547 (1st Dep't 2012); *Caesars Ent. Operating Cop. V. Appaloosa Inv. Ltd. P'ship I*, 48 Misc. 3d 1212(A), 2015 WL 4430268 at *5-6, 2015 N.Y. Slip

81.     Thus, Sun8's TIWC allegations, which sought damages based upon activity protected by New York's anti-SLAPP statutes, could never have supported a claim for tortious interference with contract.

82.     Accordingly, Dynamic is entitled to attorney's fees and costs under New York's anti-SLAPP laws, both for the defense of the Sun8 Lawsuit as well as for this action seeking recovery of damages.

***The Sun Defendants Commenced the Sun8 Lawsuit to Harass, Punish, or Otherwise Maliciously Inhibit Dynamic's Free Exercise of Speech, Petition, or Association Rights, Causing Dynamic Substantial Damage***

83.     Notably, the Sun8 Lawsuit alleged that Dynamic's "tortious conduct" extended farther than simply its single communication with the Town Supervisor on March 16, 2017, described above.  The Sun8 Lawsuit alleged that Dynamic "contact[ed] town officials, members of the Dryden Planning Board and/or Town Board, and town residents," and "actively provoked opposition from town residents."  These are all allegations of Dynamic engaging in the "free exercise of speech, petition, or association rights" within the meaning of New York Civil Rights Law §§ 70-a.

84.     The Sun Defendants have admitted that the purpose of the Sun8 Lawsuit was to harass, intimidate, or punish Dynamic for engaging in the free exercise of its speech, petition, or association rights, or to otherwise inhibit Dynamic's free exercise of those rights, within the meaning of New York Civil Rights Law §§ 70-a.

85.     This is apparent from various statements made by Sun8 and CEO Weir, as well as the incoherent nature of the TIWC Claim and the Sun8 Lawsuit.

---

Op. 51095(U) (Sup. Ct. N.Y. Cty. July 20, 2015) (dismissing claim predicated upon allegedly false statements made to administrative body because "[b]oth the First and Second Departments have expressly held that the *Noerr-Pennington* doctrine applies to common law tort claims," including tortious interference with contract).

86.     As noted above, the Sun Defendants blamed Dynamic for its public participation, which, in the Sun Defendants' judgment, had caused delays in their public applications process.

87.     By the time the Sun Defendants filed the Sun8 Lawsuit in October 2017, upon information and belief, their public applications had already long been approved.  Remarkably, however, the Sun Defendants continued to assert in court papers filed in the Sun8 Lawsuit that Dynamic had caused the Town Board and Planning Board proceedings to be protracted, and that as a consequence, Dynamic was to blame for Sun8's inability to raise capital from investors.

88.     The Sun Defendants' vindictiveness was on full display when CEO Weir called two employees of Dynamic on October 26, 2017 and threatened to bring a "tortious interference" lawsuit to "f@$% [Dynamic] up." He said he was prepared to spend $500,000 to accomplish this.

89.     The next day, Distributed Sun caused Sun8 to file the Sun8 Lawsuit.  The Sun Defendants could not have believed they would prevail on the frivolous and unintelligible TIWC Claim.  The goal, upon information and belief, was simply to punish Dynamic for opposing Sun8's permit applications.  Based on the forgoing, and upon information and belief, the Sun Defendants filed the Sun8 Lawsuit only to punish Dynamic for its earlier public participation.

90.     Accordingly, upon information and belief, the purpose of the Sun8 Lawsuit was to harass, intimidate, or punish Dynamic for its public participation, or to otherwise maliciously inhibit Dynamic's free exercise of its speech, petition, or association rights.

91.     On June 6, 2018, Dynamic's motion to dismiss the entire Sun8 Lawsuit was granted, and the court ordered the dismissal on June 27, 2018.

92.     By reason of the forgoing, Dynamic is entitled to compensatory damages and punitive damages from the Sun Defendants.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract -- Against Pinney**

93.    Plaintiff repeats and re-alleges paragraphs 1 through 92 as if fully set forth herein.

94.    Dynamic and Pinney entered into the Dynamic Lease Option, an enforceable contract.

95.    Dynamic performed on its obligations under the Dynamic Lease Option by, among other things, making a $1,000 payment to Pinney.

96.    Pinney breached the Dynamic Lease Option, including by leasing the same land to Sun8, thereby rendering his performance impossible.  Pinney further materially breached the Dynamic Lease Option when his attorney, Guttman recorded the Sun8 Lease — which covered land that Pinney was contractually obligated to lease to Dynamic – with the Tompkins County Clerk.

97.    Pinney also failed to perform on his obligations under the Dynamic Lease Option because he refused to negotiate or enter into a lease with Dynamic after Dynamic exercised its option, and otherwise refused to honor Dynamic's notice that it was exercising its option.

98.    As a result of the foregoing, Dynamic suffered damages, including:

   a.    The wasted costs associated in developing the solar project, including without limitation, costs associated with Dynamic's due diligence, application for an interconnection, application for the NYSERDA grant, and other costs including for the value of its employees' time spent developing the project, in an amount to be determined at trial;

   b.    The amount of the NYSERDA grant, $1,051,655.44, which Dynamic obtained for use at the Subject Property but is no longer available;

20

      c.      Lost development profits of $1,575,664 as the engineering, procurement, and construction contractor of the solar development;

      d.      Lost energy sales profits in an amount to be determined at trial, but no less than $5,070,947; and

      e.      In the alternative to the loss of energy sales profits in (d), the loss of the value of the solar project's operating rights in an amount to be determined at trial, but no less than $4,000,000.

99.     Because the Dynamic Lease option expressly contemplated the development of the solar project by Dynamic, the damages suffered by Dynamic were within the contemplation of the parties at the time the contract was made.

## SECOND CLAIM FOR RELIEF
**Filing a Strategic Lawsuit Against Public Participation -- Against the Sun Defendants**

100.    Plaintiff repeats and re-alleges paragraphs 1 through 99 as if fully set forth herein.

101.    Distributed Sun and Sun8 were public applicants or permittees within the meaning of the New York Civil Rights Law §§ 70-a and 76-a.

102.    Distributed Sun caused Sun8 to sue Dynamic, and Sun8 did so, by filing the Sun8 Lawsuit on October 27, 2017, in New York Supreme Court, Tompkins County.

103.    The Sun8 Lawsuit was "materially related to any efforts by the defendant [Dynamic] to report on, comment on, rule on, challenge, or oppose" Distributed Sun and Sun8's public application, within the meaning of New York Civil Rights Law §§ 70-a and 76-a.

104.    The Sun8 Lawsuit, and in particular the TIWC Claim, was commenced and continued (including by seeking discovery, opposing a motion to dismiss, filing a proposed order to lift the stay of discovery, and engaging in other costly and unnecessary litigation) by Distributed Sun and Sun8 without a substantial basis in fact or law, nor could it have been

supported by a substantial argument for the extension, modification, or reversal of existing law. Accordingly, Dynamic is entitled to costs and attorney's fees under New York Civil Rights Law § 70-a(a).

105.    Additionally, the Sun8 Lawsuit was commenced and continued (including engaging in expensive motion practice, as noted above) by Distributed Sun and Sun8 for the purpose of harassing, intimidating, punishing, or otherwise maliciously inhibiting the free exercise of Dynamic's speech, petition, or association rights.  Accordingly, Dynamic is entitled to compensatory damages in accordance with New York Civil Rights Law §§ 70-a(b).

106.    Furthermore, harassing, intimidating, punishing, or otherwise maliciously inhibiting the free exercise of Dynamic's speech, petition, or association rights was the sole purpose of Distributed Sun and Sun8 commencing and continuing (including engaging in expensive motion practice) the Sun8 Lawsuit.  Accordingly, Dynamic is entitled to punitive damages in accordance with New York Civil Rights Law § 70-a(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court award:

a.  Damages from Pinney for the wasted costs associated in developing the solar project, including without limitation, Dynamic's due diligence, application for an interconnection, application for the NYSERDA grant, and other costs, in an amount to be determined at trial;

b.  Damages from Pinney for the value of Dynamic's time spent developing its planned solar project, in an amount to be determined at trial;

c.  Damages from Pinney in the amount of $1,051,655.44, constituting the value of the NYSERDA grant that Dynamic obtained for use at the Subject Property but lost due to Pinney's breach of contract;

d.  Damages from Pinney constituting the lost development profits Dynamic was reasonably certain to earn as the engineering, procurement, and construction contractor for the solar development, in an amount to be determined at trial;

e.  Damages from Pinney for the value of the energy sales profits from Dynamic's planned solar project that it lost due to Pinney's breach of contract, in an amount to be determined at trial;

f.  Damages from Pinney for the loss of value not realized from Dynamic's planned solar project, in an amount to be determined at trial;

g.  Costs and attorney's fees of defending the Sun8 Lawsuit, from Distributed Sun and Sun8;

h.  Costs and attorney's fees of preparing and prosecuting the Second Cause of Action in the instant proceeding, from Distributed Sun and Sun8;

i.  Compensatory Damages from Distributed Sun and Sun8, in an amount to be determined at trial;

j.  Punitive Damages from Distributed Sun and Sun8, in an amount to be determined at trial;

k.  Reasonable attorneys' fees and costs incurred in connection with recovering damages owed to Plaintiff;

l.  An award of costs and prejudgment interest under CPLR 5001 et seq.; and

m.  Any additional relief that this Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff demands trial by jury of all claims triable to a jury in this action.

Dated:  New York, New York          BOND, SCHOENECK & KING, PLLC
July 27, 2018


By:    s/ Brian J. Butler
       Brian J. Butler
       Brendan M. Sheehan
One Lincoln Center
Syracuse, NY 13202-1355
Tel:    (315) 218-8000
Email: butlerb@bsk.com
       bsheehan@bsk.com

*Attorneys for Plaintiff*


Of Counsel:

WALDEN MACHT & HARAN LLP

Jim Walden (*admission pro hac vice forthcoming*)
Adam P. Cohen (*admission pro hac vice forthcoming*)
Dan Cohen (*admission pro hac vice forthcoming*)

One Battery Park Plaza, 34th Floor
New York, NY 10004
Tel.:  212-335-2030
Email:  jwalden@wmhlaw.com
        acohen@wmhlaw.com
        dcohen@wmhlaw.com

*Attorneys for Plaintiff*